UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NAVEEN ANAND, | § | |
| | § | |
| Plaintiff/Counterclaim-Defendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:24-CV-3181-B |
| | § | |
| HALLMARK FINANCIAL SERVICES, | § | |
| INC., | § | |
| | § | |
| Defendant/Counterclaimant. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff/Counterclaim-Defendant Naveen Anand's Motion to Dismiss

Hallmark Financial Services, Inc. ("Hallmark")'s Counterclaims (Doc. 59). For the reasons stated

below, the Court **GRANTS in part** and **DENIES in part** Anand's Motion to Dismiss.

I.

BACKGROUND

The countersuit in this case involves allegations of misconduct lodged by an insurance

company against its ex-officer. Anand served as Chief Executive Officer and President of Hallmark

from 2014 through 2020. Doc. 12, Answer & Countercls. ¶ 51.[1] Hallmark is a Nevada corporation,

headquartered in Texas, that is in the business of insurance underwriting. *Id.* ¶ 62.

A.    *The 2018 and 2019 Claim Reserve Practices*

Insurance companies like Hallmark maintain "claim" and "loss reserves" to ensure that they

---

[1] On February 12, 2026, Hallmark filed its Second Answer to Anand's Supplemental Complaint. *See generally* Doc. 52, Second Answer. In its Second Answer, Hallmark incorporated its counterclaims, originally filed as ECF Document 12. *See id.* at 1. Accordingly, this Court cites to Anand's ECF Document 12 for its counterclaims and related allegations. *See* Doc. 12, Answer & Countercls., 6-28.

have adequate funds to cover pending and future insurance claims. *See id.* ¶¶ 67-68. Loss reserves are an estimate of an insurance company's total liability for future losses, including both pending claims and anticipated claims. *Id.* ¶ 68. They are accounted for as liabilities on a balance sheet. *See id.* Claim reserves are a component of loss reserves that estimate the cost of only existing, but unresolved claims. *Id.* ¶ 67. Hallmark's internal procedures required claims management staff to set initial claim reserves based on an evaluation of each claim's "most probable ultimate outcome." *Id.* ¶ 73. This was to be done on a case-by-case basis using "all available information." *Id.* Claims management could then adjust those reserves as they received more information about a given claim. *Id.* ¶ 67.

In or around August 2018, Anand began overseeing a scheme to arbitrarily reduce Hallmark's aged commercial auto claim reserves. *Id.* ¶ 52. For this scheme, Anand enlisted Charles Stauber, who was Hallmark's Senior Vice President and Chief Claims Officer. *Id.* ¶¶ 65, 71. In what was surreptitiously referred to as the "Reserve Redundancy Project," Stauber and a subordinate claims manager (the "Claims Manager") reduced aged commercial auto claim reserves to uniform amounts of $75,000, $25,000, and $5,000. *Id.* ¶ 72. Hallmark refers to these uniform reductions as "takedowns." *Id.* Anand was aware that the takedowns violated Hallmark's internal procedures. *Id.* ¶¶ 71, 78. Yet neither Anand, nor other senior management, disclosed the takedowns to the Board. *Id.* ¶ 81. And at Anand's direction, Stauber continued the takedowns into 2019. *Id.* ¶¶ 84-87.

B.      *The Outside Audit*

At the beginning of 2020, Hallmark's independent auditor, BDO, began raising concerns about Hallmark's loss reserve calculations for the 2019 fiscal year. *Id.* ¶ 88. The concerns were first raised only to Anand, the Chief Actuary, and the Chief Financial Officer. *Id.* In response to that meeting, Stauber instructed the Claims Manager to increase certain previously reduced claim

reserves to $75,000. *Id.* ¶ 89. In February 2020, BDO delivered a 17-page letter noting that, in an "unusual pattern[]," the claim reserves for "the first three quarters of 2019 were significantly below historical averages" and the year-end quarter "increased significantly." *Id.* ¶ 90 (internal quotation marks omitted). Shortly thereafter, Anand and other members of senior management provided the Audit Committee, which includes Hallmark's entire Board of Directors and three independent directors, a lengthy memorandum to show that "BDO's concerns were entirely misplaced and unreasonable." *Id.* ¶¶ 91-92. The memorandum did not mention the Reserve Redundancy Project or takedowns. *See id.* ¶ 92.

At the end of February, BDO wrote directly to the Board to "reconfirm its request that management investigate the unusual changes in [claim] reserves and provide a written report." *Id.* ¶ 94 (citation modified). Addressing BDO's request, Anand and senior management told the Audit Committee that communications between Hallmark and BDO had "broken down" and that "further responses" from Hallmark would not satisfy BDO. *Id.* ¶ 95. In March, BDO twice asked to review commercial auto claim files. *Id.* ¶ 101. In response, Anand sent BDO an analysis for certain unsuppressed 2019 claims. *Id.* ¶ 102. When BDO persisted in asking for direct access to claim files, Anand and senior management met with the Board and "appeared to provide credible explanations for each issue raised by BDO and claimed that no amount of information would satisfy BDO." *Id.* ¶ 104. Based on Anand's assertions, the Audit Committee terminated BDO. *Id.*

C.      *The DARAG Deal*

In early 2020, Hallmark stopped underwriting new commercial auto insurance policies. *Id.* ¶ 106. But it maintained responsibility for claims on existing policies, known as "run-off" claims. *Id.* Hallmark began looking for another company to reinsure those run-off claims and assume

operational responsibility. *Id.* ¶¶ 107-08. As part of that process, Anand supervised the drafting of a confidential information memorandum that would be sent to potential reinsurers. *Id.* ¶ 109. The confidential information memorandum did not disclose the takedowns. *Id.* ¶ 110. Instead, it affirmed Hallmark's commitment to its own internal claim processing procedures. *Id.*

In April 2020, a family of insurance companies called DARAG offered to reinsure the run-off claims. *Id.* ¶ 112. In the DARAG-Hallmark contract, Hallmark affirmed that the "reserves reflected in historical claims data provided as of December 31, 2019 were accurate in all material respects[.]" *See id.* ¶ 114. In July 2020, on Anand's recommendation, the Board approved the transaction, and Anand signed the contract on Hallmark's behalf. *Id.* ¶ 116.

D.      *The Employee Warnings*

On September 29, 2020, an anonymous whistleblower sent Hallmark's new auditor the following tip:

> I write because i was told that you will have to investigate the reserve misrepresentations that have been taking place at Hallmark for the past 29 months. Hallmark has been and continues to under reserve the IBNR for several lines of business. This intentional misrepresentation occurs in several ways and includes top level decision makers at the company, claims, Naveen actuarial and financial reporting. I am currently an employee and have admittedly been a part of these activities and am aware of individuals in the claims team who are asked regularly to adjust reserves according to what Hallmark wants to depict in their results . . . .

*Id.* ¶ 117 (emphasis removed). In response, the Audit Committee hired outside counsel to investigate the whistleblower's tip on October 1, 2020. *Id.* ¶ 118.

Separately, on October 13, 2020, the Claims Manager sent outside counsel a "detailed memo" stating she reduced claim reserves in the commercial auto line three times starting in 2018. *Id.* ¶ 119. She said she reduced the claims at Stauber's and Anand's request. *Id.* ¶ 119. Hallmark authorized outside counsel to include the Claims Manager's allegations in the investigation. *Id.*

¶ 120.

Anand, in his interview with outside counsel, stated that the Reserve Redundancy Project was based on his observation "that claims were closed at less than the claims reserves" but denied telling Stauber to lower claim reserves to uniform amounts. *Id.* ¶ 122. Stauber refused to cooperate with outside counsel's investigation. *Id.* ¶ 121.

On December 3, 2020, Stauber met with the Head of Human Resources ("HR") and informed him that Anand was present at a meeting in 2019 where Stauber was instructed to "smooth" claim reserves. *Id.* ¶ 126. Stauber further stated that "Anand and another senior executive were responsible." *Id.* ¶ 127. After the meeting, the Head of HR asked Anand if he should tell the Board what Stauber had admitted. *Id.* ¶ 128. Anand suggested to the Head of HR that he not reveal Stauber's statements because outside counsel was already investigating the matter. *See id.* ¶¶ 128-29. Both Anand and the Head of HR resigned in January 2021. *Id.* ¶ 131.

E.    *The DARAG Arbitration*

On February 15, 2022, DARAG initiated an arbitration proceeding against Hallmark, seeking rescission of the contract. *Id.* ¶ 132. DARAG alleged in its petition that it was fraudulently induced into reinsuring the run-off claims because Hallmark did not disclose that it reduced its claim reserves in 2018 and 2019. *Id.* ¶ 133. The arbitration panel found rescission of the contract appropriate because Hallmark, by "wrongfully suppress[ing] its claim reserves," had not met the contract's "honorable engagement" intent standard. *Id.* ¶¶ 135-36.

On August 18, 2023, the Board learned that the Head of HR had taken notes during his meeting with Stauber and "became concerned that it had received incomplete information" from outside counsel's investigation regarding Anand's participation in suppressing claim reserves. *Id.*

¶ 138. Hallmark then authorized a new investigation. *Id.* ¶ 139.

F.      *Hallmark's Counterclaims.*

Hallmark—recognizing that it may pursue claims against Anand in the future—executed a tolling agreement with Anand. *Id.* ¶ 48. Effective October 14, 2024, Hallmark agreed not to sue Anand, and Anand agreed that the statute of limitations would be tolled while the agreement was in effect. *Id.*; Doc. 60, Anand Br., 3 n.2. On December 18, 2024, Anand terminated the tolling agreement and filed suit against Hallmark for advancement of pre-suit defense expenses. *See generally* Doc. 1, Compl. On February 7, 2025, Hallmark asserted counterclaims against Anand for (1) breach of fiduciary duty and (2) contribution for his percentage of responsibility for Hallmark's liability to DARAG.[2] Doc. 12, Answer & Countercls. ¶¶ 140-54.

On February 23, 2026, Anand filed his second Motion to Dismiss Hallmark's Counterclaims. *See generally* Doc. 59, Mot. In the Motion, Anand argues dismissal of Hallmarks' claims is appropriate because (1) the limitations period has passed on the breach of fiduciary duty claim and no tolling doctrine applies and (2) without allegations showing the arbitrator found Hallmark to be a tortfeasor, Hallmark cannot plausibly allege a contribution claim. Doc. 60, Anand Br., 11-24. Hallmark filed a response (Doc. 62), and Anand filed a reply (Doc. 71). The Motion to Dismiss is now ripe, and the Court rules on it below.

---

[2] Hallmark also asserted fraudulent concealment doctrine as a separate cause of action. *See* Doc. 12, Answer & Countercls. ¶¶ 144-48. But the fraudulent concealment doctrine is a tolling doctrine, not an independent cause of action. *Llort v. BMW of N. Am., LLC*, No. 1:20-CV-94-LY, 2020 WL 2928472, at *10 (W.D. Tex. June 2, 2020) (collecting cases), *report and recommendation adopted*, No. 1:20-CV-94-LY, 2020 WL 10054589 (W.D. Tex. June 19, 2020). Accordingly, to the extent Hallmark raises the fraudulent concealment doctrine as its own cause of action, it is dismissed.

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) authorizes a defendant to move for dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation modified).

## III.

## ANALYSIS

The Court must resolve two issues in order to decide this Motion to Dismiss. The first issue is whether a tolling doctrine could plausibly make Hallmark's breach of fiduciary duty claim timely. The second issue is whether Hallmark plausibly alleges a contribution claim. The Court addresses both issues below.

A.    *The Breach of Fiduciary Duty Claim*

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) (citations omitted). But "[i]t is well

settled . . . that in order for a defendant to prevail on the basis of limitations at the pleadings stage, the plaintiff must normally plead [it]self out of court." *W. Fork Partners v. Chesapeake Expl., LLC*, No. 3:09-CV-0370-D, 2009 WL 2252505, at *5 (N.D. Tex. July 29, 2009) (Fitzwater, C.J.) (citations omitted).

Breach of fiduciary duty claims are governed by a four-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(5). "Generally, a claim accrues when the defendant's wrongful conduct causes the claimant to suffer a legal injury." *McGrath v. Brewer*, No. 24-50335, 2025 WL 2828853, at *3 (5th Cir. Oct. 6, 2025) (quoting *Berry v. Berry*, 646 S.W.3d 516, 523 (Tex. 2022)). "A legal injury occurs 'when facts come into existence that authorize a party to seek a judicial remedy.'" *Id.* (quoting *Berry*, 646 S.W.3d at 523). "This is true even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *Id.* (citation modified) (quoting *Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc. v. Triex Tex. Holdings, LLC*, 659 S.W.3d 456, 461 (Tex. 2023) (per curiam)).

Anand argues that Hallmark's breach of fiduciary duty claim is untimely because the alleged wrongful conduct that caused Hallmark to suffer a legal injury was the takedowns that began in 2018 and ended in 2019—six or more years before Hallmark asserted its counterclaims in 2025. *See* Doc. 60, Anand Br., 12-14. Hallmark does not dispute the accrual date proposed by Anand but argues that three tolling doctrines gave Hallmark more time to file. *See* Doc. 62, Hallmark Resp., 9 ("Regardless of the accrual date of the counterclaims, Hallmark has adequately plead that the statute of limitations should be equitably tolled . . . ."). Those three tolling doctrines are the fraudulent concealment doctrine, the continuing tort doctrine, and the discovery rule. *See* Doc. 62, Hallmark Resp., 9-21.

The Court finds Hallmark has plausibly alleged facts going to each prong of the fraudulent concealment doctrine. Accordingly, the Court does not address tolling under the continuing tort doctrine or the discovery rule in this opinion.

Fraudulent concealment is a fact-specific equitable doctrine that precludes a defendant from raising a statute of limitations defense if he had a duty to disclose but instead concealed his bad acts. *Valdez v. Hollenbeck*, 465 S.W.3d 217, 229-30 (Tex. 2015) (citation omitted). The doctrine tolls limitations until "the fraud is discovered or could have been discovered with reasonable diligence." *Id.* at 229. Under Texas law, a plaintiff must allege facts going to each prong of the fraudulent concealment doctrine's four-prong test to avoid dismissal: "(1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception." *Thompson v. Deutsche Bank Nat'l Tr. Co.*, 775 F.3d 298, 307 (5th Cir. 2014) (citation modified).

But even if a plaintiff can plausibly allege facts for each prong, the claim is only tolled until the "party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to the discovery of the concealed cause of action." *Valdez*, 465 S.W.3d at 230 (citation omitted). That is because knowledge of facts causing a reasonably prudent person to make an inquiry "is in law equivalent to knowledge of the cause of action." *Id.* (citation omitted).

When the wrongdoer is a fiduciary, that unique relationship changes the circumstances that would normally cause a reasonable person to make further inquiry. The Texas Supreme Court discussed the impact a fiduciary relationship has on the doctrine's application in *Valdez*:

> A fiduciary relationship gives rise to a duty of full disclosure of all material facts.. . .
> A person to whom a fiduciary duty is owed may be unable to inquire into the

fiduciary's actions or may be unaware of the need to do so. . . . Moreover, even if inquiry is made, facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved. . . . Still, when the fact of misconduct is evident, diligent inquiry is required.

*Id.* at 230-31 (citation modified).

Hallmark's counterclaims plausibly allege facts going to each prong of the fraudulent concealment doctrine. Starting with prongs one and two, existence and knowledge of the underlying tort, Hallmark plausibly alleged that the malfeasance began as early as 2018 and that Anand committed the acts and omissions knowingly. *See* Doc. 12, Answer & Countercls. ¶ 142. Turning to prong three, deception, Hallmark alleges that Anand concealed the unlawful conduct by not disclosing the takedowns to the Board, disputing and discrediting BDO's concerns, hiding the truth from outside counsel, and advising the Head of HR to not disclose the details of Stauber's meeting to the Board. *Id.* ¶146; Doc. 62, Hallmark Resp., 9-10. Lastly, for prong four, reasonable reliance, Hallmark alleges that it reasonably relied on Anand's assurances that nothing was amiss because Anand was its most senior fiduciary. *See id.* ¶ 147. Because of Anand's deception, Hallmark argues it did not learn of the takedown scheme until DARAG commenced the arbitration proceedings in 2022.[3] *See* Doc. 62, Hallmark Resp., at 12. Because Hallmark has alleged facts going to each prong of the fraudulent concealment doctrine, the Court finds Hallmark has not plead itself out of court. *See W. Fork Partners*, 2009 WL 2252505, at *5.

Anand argues the fraudulent concealment doctrine does not save Hallmark's claim because Hallmark "learned of facts" that would have "cause[d] a reasonably prudent person to make [an]

---

[3] In its counterclaims, Hallmark asserts the statute of limitations was tolled until August 18, 2023, when it discovered the Head of HR's notes from Stauber's termination meeting. Doc. 12, Answer & Countercls. ¶ 147. In its response to the Motion to Dismiss, Hallmark concedes that the applicable statute of limitations would only be tolled under the fraudulent concealment doctrine until the commencement of the DARAG arbitration in February 2022. *See* Doc. 62, Hallmark Resp., 12.

inquiry," which would end equitable tolling. *Valdez*, 465 S.W.3d at 230; *see* Doc. 71, Reply, 5. In support, Anand points to the BDO audit, whistleblower tip, and Claims Manager's memo that raised concerns about claim reserve practices. *See* Doc. 60, Anand Br., 2.

At the motion-to-dismiss stage, the Court lacks the full factual context necessary to conclude whether the audit or internal employee alerts would have caused a "reasonably prudent person" to inquire into Anand and his role in the Reserve Redundancy Project. To start with the BDO audit, Hallmark alleges that senior management, including Anand, disputed BDO's concerns. That alleged fact makes it plausible that Hallmark acted with "reasonable prudence" by heeding the opinion of its fiduciaries and deciding not to inquire further.

For the anonymous whistleblower tip and Claim Manager's report as well, additional factual development is necessary before concluding whether Hallmark knew of facts "which would cause a reasonably prudent person to make inquiry." *See Valdez*, 465 S.W.3d at 230. The counterclaims allege that the whistleblower tip was sent to Hallmark's new auditor. Doc. 12, Answer & Countercls. ¶¶ 117-18. The Audit Committee then retained independent counsel to investigate the tip. *Id.* It is unclear whether the context surrounding the whistleblower's tip made it credible enough on its own to cause a "reasonably prudent person" to question the company's chief executive. Likewise, Hallmark alleges that the Claims Manager sent a detailed memo to Hallmark's outside counsel. *Id.* ¶ 119. The Audit Committee then authorized outside counsel to include the Claims Manager's allegations in their investigation. *Id.* ¶ 120. Without additional context, the Court cannot evaluate the reasonableness of investigating, but not yet pointing the finger at Anand, in response to the Claims Manager's memo. Reviewing the allegations in the light most favorable to Hallmark, it is plausible that reasonable prudence did not require further inquiry into Anand. *See Valdez*, 465

S.W.3d at 231. The Court cannot say at the motion to dismiss stage whether a reasonably prudent person would have credited the whistleblower's tip and Claims Manager's statement even after the company's principal fiduciary called the contents of the accusations into question.

Based on the allegations in the counterclaims, viewed in the light most favorable to Hallmark, it is plausible that the fraudulent concealment doctrine would defer the accrual of the breach of fiduciary duty claim until the DARAG arbitration. Because the Court finds the breach of fiduciary duty claim survives dismissal under the fraudulent concealment doctrine, it need not address the remaining tolling arguments.

B.      *The Contribution Claim*

Chapter 33 of the Texas Civil Practice and Remedies code permits a defendant that pays more of its share in damages to obtain reimbursement from other jointly and severally liable defendants. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.015(a). But contribution claims are "allowed in Texas only among joint tortfeasors." *Samsung Elecs. Am., Inc. v. Yang Kun "Michael" Chung*, No. 3:15-CV-4108-D, 2018 WL 1532383, at *6 (N.D. Tex. Mar. 29, 2018) (quoting *CBI NA-CON, Inc. v. UOP Inc.*, 961 S.W.2d 336, 339 (Tex. App. 1997, pet. denied)); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 33.002(a)(1) ("This chapter applies to: [ ] any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought."). Accordingly, a defendant found responsible for breach of contract cannot seek contribution under Chapter 33. *See In re Mobile Mini, Inc.*, 596 S.W.3d 781, 787 n.2 (Tex. 2020).

Here, the issue is whether Hallmark plausibly alleged facts showing the arbitrator found it a tortfeasor. In his Motion to Dismiss, Anand argues dismissal of the contribution claim is appropriate

because Hallmark does not allege the arbitration award was based on a claim other than the "breach of the honorable engagement standard" from the contract. Doc. 60, Anand Br., 23. In response, Hallmark argues that it has plausibly alleged a contribution claim because "DARAG brought a claim for fraudulent inducement against Hallmark, not just breach of contract." Doc. 62, Hallmark Resp., 21.

Dismissal of the contribution claim is appropriate because Hallmark does not allege that the arbitration panel awarded tort damages. Hallmark alleges the arbitration panel found it breached the honorable engagement standard from the DARAG-Hallmark contract. Doc. 12, Answer & Countercls. ¶151. This indicates that the arbitration panel awarded damages based on a breach of contract claim. Merely alleging that DARAG asserted a tort claim in the arbitration proceeding is insufficient to plausibly state a claim for contribution.

The Court finds dismissal of the contribution claim without prejudice is appropriate. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). District courts give plaintiffs leave to amend their complaints "when justice so requires." Fed. R. Civ. P. 15(a)(2). Because a contribution claim could conceivably exist if facts not previously presented would support it, the Court finds dismissal without prejudice is appropriate.

## IV.

## CONCLUSION

For the reasons stated above, the Court **DENIES in part** and **GRANTS in part** Anand's

Motion to Dismiss (Doc. 59).

The Court **DISMISSES without prejudice** Hallmark's contribution claim. If Hallmark

wishes to file an amended contribution counterclaim, it must do so by or before June 25, 2026.

Anand's answer is due by July 9, 2026.


**SO ORDERED**.

**SIGNED: June 11, 2026.**


_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE